UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK SERRI, on Behalf of Himself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  -against-<br><br>BANK OF NOVA SCOTIA; SCOTIA CAPITAL (USA) INC.; SCOTIA HOLDINGS (US) INC.; THE BANK OF NOVA SCOTIA TRUST COMPANY OF NEW YORK; COREY FLAUM; and JOHN DOES 1-25,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

   Plaintiff Mark Serri ("Plaintiff") brings this action on behalf of himself and the proposed class as defined herein, and upon information and belief as to all other matters against Defendants Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotia Holdings (US), Inc., The Bank of Nova Scotia Trust Company of New York (collectively, "BNS"), Corey Flaum, and John Does 1-25 (with BNS, "Defendants"), and complains as follows:

## I.  <u>SUMMARY OF ALLEGATIONS</u>

   1.  This action arises from Defendants' admittedly unlawful conduct, described herein, which occurred from approximately January 1, 2008 through July 31, 2016 (the "Class Period") and violated the Commodity Exchange Act, 7 U.S.C. §§1, et seq. (the "CEA"), and the common law. Specifically, Defendants admit that "[b]etween approximately January 2008 and July 2016 . . . four precious metals traders employed by [BNS] engaged in fraudulent and manipulative trading practices in connection with the purchase and sale of gold, silver, platinum, and palladium

futures contracts (collectively, 'precious metals futures contracts')" traded on the New York Mercantile Exchange, Inc. ("NYMEX") and Commodity Exchange, Inc. ("COMEX").[1]

2.      Defendants manipulated the prices of NYMEX platinum and palladium and COMEX silver and gold futures and options contracts during the Class Period using a technique called "spoofing" (explained *infra*) whereby Defendants routinely placed electronic orders to buy and sell such futures contracts with the intent to cancel those orders before execution. These spoof orders injected materially false and illegitimate signals of supply and demand into the market and were intended to induce other market participants to trade at futures prices that were made artificial as a result of Defendants' unlawful conduct. Indeed, Defendants admit that they "knowingly and intentionally attempted to manipulate the prices of precious metals futures contracts, and attempted to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts."[2]

3.      Defendants' actions are already the subject of criminal and regulatory enforcement, and have resulted in the largest civil monetary penalty ever ordered in a spoofing case.[3] Defendant Flaum has admitted guilt and is awaiting sentencing in the U.S. District Court for the Eastern District of New York for one count of attempted price manipulation in relation to the allegations described herein.[4] On August 19, 2020, Defendant Bank of Nova Scotia entered into a deferred prosecution agreement ("DPA") with the U.S. Department of Justice ("DOJ")[5] and a settlement

---

[1] *U.S.A. v. The Bank of Nova Scotia*, Case No. 20-707, Deferred Prosecution Agreement at Attachment A, ¶ 2, (D.N.J. Aug. 19, 2020), https://www.justice.gov/opa/press-release/file/1306141/download (hereinafter, the "DPA").
[2] DPA at Attachment A, ¶ 3.
[3] *CFTC Orders The Bank of Nova Scotia to Pay Record $77.4 Million for Spoofing and Making False Statements*, CFTC Press Release No. 8221-20 (Aug. 19, 2020), https://www.cftc.gov/PressRoom/PressReleases/8221-20.
[4] *U.S. v. Flaum*, No. 1:19-cr-00338, Information, ECF No. 2 (E.D.N.Y. July 25, 2019) (hereinafter, the "Information"); *see also Flaum*, No. 1:19-cr-00338, Minute Order Granting Motion to Continue Sentencing (E.D.N.Y. July 16, 2020).
[5] *See* DPA.

with the U.S. Commodity Futures Trading Commission ("CFTC"),[6] agreeing to pay a combined $60.4 million in criminal fines, restitution, and forfeiture of trading profits.

4.    In sum, Bank of Nova Scotia has been ordered to pay a total of $77.4 million for spoofing and making false and misleading statements. This includes $60.4 million— $6,622,190 in restitution, $11,828,912 in disgorgement, and a $42 million civil monetary penalty arising from manipulative and deceptive conduct spanning more than eight years and involving thousands of occasions of spoofing and attempted manipulation." In addition, Bank of Nova Scotia has been ordered to pay a $17 million civil penalty "for making false and misleading statements to CFTC staff."[7]

5.    Bank of Nova Scotia's compliance department "failed to detect and or deter the Subject Traders' unlawful trading practices," even when they had "substantial information" regarding the traders' conduct. According to CFTC Division of Swap Dealer and Intermediary Oversight Director Joshua B. Sterling, "BNS's compliance and supervision violations highlight the need for all swap dealers to have the right tone at the top – plus appropriate programs and incentives in place – to instill a meaningful culture of compliance among their personnel."[8]

6.    Defendants' spoof orders were intended to, and did in fact, artificially move the prices of NYMEX and COMEX precious metals futures and options contracts during the Class Period in a pre-determined direction that was favorable to Defendants, but unfavorable to Plaintiff and the proposed Class.

---

[6] *See In the Matter of: The Bank of Nova Scotia*, CFTC Docket No. 20-28, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Aug. 19, 2020), https://www.cftc.gov/media/4411/enfbankofnovascotiaspoofingorder081920/download (hereinafter, the "CFTC Order").

[7] *CFTC Orders The Bank of Nova Scotia to Pay Record $77.4 Million for Spoofing and Making False Statements*, CFTC Press Release No. 8221-20 (Aug. 19, 2020), https://www.cftc.gov/PressRoom/PressReleases/8221-20.

[8] *CFTC Orders The Bank of Nova Scotia to Pay $127.4 Million for Spoofing, False Statements, Compliance and Supervision Violations*, CFTC Press Release No. 8220-20 (Aug. 19, 2020), https://www.cftc.gov/PressRoom/PressReleases/8220-20.

7.      Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## II.    JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the CEA, 7 U.S.C. § 25. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332 and 1367, because this is a class action in which the matter or controversy exceeds $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants. This Court's exercise of supplemental jurisdiction over Plaintiff's state law claims would avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience, and fairness.

9.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. § 25(c). A significant part of the events giving rise to the claims occurred within this District. One or more Defendants resided, transacted business, were found, or had agents in this District. Defendant Flaum has been sentenced in this district. Defendant BNS maintains a COMEX-registered precious metals depository (vault) in this district.

10.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant is believed to have: (a) transacted business throughout the United States, including in this District; (b) committed overt acts in furtherance of their illegal scheme and conspiracy throughout the United Sates, including the manipulation of the prices of precious metals futures contracts and options traded in this District on the NYMEX and COMEX; (c) had and maintained substantial contacts within the United Sates, including in this District; and/or (d) directed conduct

that had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Defendants placed the spoof orders electronically from computers at least located at Defendant BNS's offices in New York onto the NYMEX and COMEX.

11.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to the mails, interstate telephone communications, and the facilities of the commodities markets. Accordingly, Defendant Bank of Nova Scotia's DPA with the DOJ involves a count of wire fraud. The activities of Defendants were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

## III.    PARTIES

### A.    Plaintiff

12.     Plaintiff Mark Serri is a resident of Medford, New York. Plaintiff transacted in precious metals futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation as alleged herein. Defendants deployed the spoofing scheme alleged herein thousands of times throughout the Class Period, depriving Plaintiff and the Class of the ability to transact in a lawful, un-manipulated market. Plaintiff suffered economic injury, including monetary losses, as a direct result of Defendants' manipulation of NYMEX and COMEX precious metals futures and options contracts during the Class Period.

### B.    Defendants

13.     Defendant Bank of Nova Scotia is a Canadian corporation with its headquarters in Toronto, Ontario, Canada. Defendant Bank of Nova Scotia operates in various locations within the United States, including New York and Houston. Defendant Bank of Nova Scotia employed Defendants Flaum and the Doe defendants during the Class Period. Defendant Flaum and certain

Doe defendants were acting within the scope of their employment with BNS when they executed the manipulative trades that are the subject of this Complaint.[9] Bank of Nova Scotia maintains a COMEX-registered precious metals depository (vault) in Jamaica, Queens, New York.

14.     Defendant Scotia Capital (USA) Inc. is a New York corporation and a registered broker and dealer in securities with the U.S. Securities and Exchange Commission, and a member of the Financial Industry Regulatory Authority and New York Stock Exchange, with its principal place of business located in New York, New York. Scotia Capital (USA) Inc. is a wholly owned subsidiary of Scotia Holdings (US) Inc., whose ultimate parent is the Bank of Nova Scotia.

15.     Defendant Scotia Holdings (US) Inc. is a Delaware corporation with its principal place of business located in Atlanta, Georgia. The ultimate parent of Scotia Holdings (US) Inc. is the Bank of Nova Scotia.

16.     Defendant The Bank of Nova Scotia Trust Company of New York is a trust company regulated by the New York State Department of Financial Services and the Federal Reserve Bank of New York whose ultimate parent company is the Bank of Nova Scotia, with its principal place of business in New York, New York.

17.     Defendant Flaum is a resident of Florida. Defendant Flaum was an employee of Defendant BNS in its New York offices from approximately June 2008 through approximately August 2016. From his desk in New York, he used the following "Tag50" identifications to place manipulative orders: BSNCFLAUM, CFLAUM, and CCCFLAUM. The DOJ charged Defendant Flaum with, and Defendant Flaum pled guilty to, one count of attempted price manipulation related to the conduct at issue in this Complaint.[10]

---

[9] DPA at Attachment A, ¶ 13 ("In placing Manipulative Orders, the Subject Traders were acting within the scope of their employment as employees of [BNS] and with the intent, at least in part, to benefit the Company.").
[10] *See* Information.

18.      Defendants John Doe Nos. 1-25 are other individuals or entities that participated in the manipulation and unlawful conduct described herein. These defendants may include other financial firms or employees, agents, or affiliates of BNS, including, but not limited to, the precious metals traders employed by BNS or one of its affiliates. For example, the DPA names Subject Trader 2 ("ST-2"), Subject Trader 3 ("ST-3"), and Subject Trader 4 ("ST-4").[11]

## IV.    SUBSTANTIVE ALLEGATIONS

### A.      Definitions

19.      The CME Group is comprised of four Designated Contract Markets ("DCMs"), including the NYMEX and COMEX. The CME Group is also the holding company and the parent of the NYMEX and COMEX. The CME Group's Global Headquarters is located at Chicago, Illinois.

20.      CME Globex is owned and operated by the CME Group. CME Globex is the premier electronic trading platform used to trade futures and options contracts. CME Globex is an open access marketplace that allows a market participant to directly enter his or her own trades and participate in the trading process, including viewing the book of orders and real-time price data nearly 24 hours a day.

21.      CME Globex permits the trading of futures and options contracts or securities, between buyers and sellers, including trading other than on a principal-to-principal basis. CME Globex is subject to NYMEX and COMEX rules, including rules that (a) govern the conduct of CME Globex users, and (b) provide for disciplinary sanctions other than the exclusion from trading. CME Globex falls within the Commodity Futures Trading Commission's definition of an

---

[11] DPA at Attachment A, ¶ 2.

"exchange;" i.e., "[a] central marketplace with established rules and regulations where buyers and sellers meet to trade futures and options contracts or securities."

22.     A variety of CME Group products are available to trade on the CME Globex platform including, but not limited to, precious metals futures and options contracts. To access CME Globex, customers must have a CME Group clearing firm relationship, CME Group-certified trading application and connectivity to CME Globex. Thus, anyone who has an account with a Futures Commission Merchant or Introducing Broker, who in turn has a CME Clearing guarantee, can trade on CME Globex.

23.     **Commodity Futures Contract.** A commodity "futures" contract is a promise to buy or sell a predetermined amount of a commodity at a specific price and at a specific time in the future. In the context of futures trading, the commodity is the underlying instrument upon which a futures contract is based; i.e. the trading occurs in the contract, not in the commodity. The NYMEX and COMEX, as DCMs pursuant to Section 5 of the CEA, 7 U.S.C. § 7, specify the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations, and margin requirements.

24.     **"Long" and "Short" Futures.** Trades of precious metals on NYMEX and COMEX have two "sides." The "long" side represents the buyer of a contract who is obligated to pay for the precious metal and take delivery. The "short" side represents the seller of a contract who is obligated to receive payment for the precious metal and make delivery. If a market participant holds its position to the end of the settlement period for a precious metals futures contract, the market participant is obligated to "go to delivery." In other words, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the

purchase and sale of the physical precious metal. The price for the precious metal that goes to delivery is the "settlement price" of the futures contract.

25.    **Offset by Trading.** Only a small percentage of all futures contracts traded each year on NYMEX and COMEX result in actual delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of one futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery by selling one equivalent futures contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

26.    Wholly unlike the securities markets, in the commodity futures market, (1) more than 99% of the contracts do not result in delivery and may remain open for multi-month periods with no delivery of the commodity, and (b) at any given time, one-half of the participants in the futures market are sellers of a contract or "short" and one-half of the participants are the buyers of a contract or "long."

27.    **Commodity Options Contract.** A commodity "options" contract is a promise that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell the underlying commodity at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy or sell the underlying commodity (in this case, NYMEX and COMEX precious metals futures contracts). Generally, there are two types of options: calls and puts.

28.    **"Call options"** give the holder of the option the right, but not the obligation, to buy the underlying commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer" the obligation to sell the commodity at the strike price. The buyer (the

"long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

29.    **"Put options"** confer upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price, and they confer upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

30.    A **NYMEX Platinum Futures Contract** is a futures contract where the underlying commodity is 50 troy ounces of platinum. NYMEX platinum futures contracts are listed on the NYMEX, subject to the rules and regulations of NYMEX including Chapter 105 of the NYMEX Rulebook, and traded electronically on the CME's Globex platform.

31.    A **NYMEX Palladium Futures Contract** is a futures contract where the underlying commodity is 100 troy ounces of palladium. NYMEX palladium futures contracts are listed on the NYMEX, subject to the rules and regulations of NYMEX including Chapter 106 of the NYMEX Rulebook, and traded electronically on the CME's Globex platform.

32.    A **COMEX Silver Futures Contract** is a futures contract where the underlying commodity is 5,000 troy ounces of silver. COMEX silver futures contracts are listed on the

COMEX, subject to the rules and regulations of COMEX including Chapter 112 of the COMEX Rulebook, and traded electronically on the CME's Globex platform.

33.    A **COMEX Gold Futures Contract** is a futures contract where the underlying commodity is 100 troy ounces of gold. COMEX gold futures contracts are listed on the COMEX, subject to the rules and regulations of COMEX including Chapter 113 of the COMEX Rulebook, and traded electronically on the CME's Globex platform.

**B.    Market Background**

34.    Precious metals futures contracts and options are traded on COMEX and NYMEX. These contracts, during various parts of the Class Period, were traded in both an "open-outcry" setting and on an electronic trading platform. In recent years, complex, automated, and high-speed trading strategies have taken hold in virtually every financial market, including commodities futures markets, making the markets much more susceptible to manipulation. Driving this change has been a massive shift to Automated Trading Systems (ATSs) otherwise known as algorithmic trading.

35.    A study completed by the Commodity Futures Trading Commission ("CFTC") determined that between October 2012 and 2014, over 95% of all futures traded on any exchange occurred on DCMs' electronic trade matching platforms, such as NYMEX and COMEX.

36.    Additionally, as seen in the figure below, commodity markets, including those of metals, have become more accessible to a larger number of investors.



37.     In addition, the CFTC found that the two largest U.S. DCMs have indicated that their average order entry roundtrip times are less than one millisecond.

38.     High speed trading is more susceptible to manipulative trading activities. Regulators at large have adapted to focus on the computer-driven nature of trading, with nearly every significant regulator voicing concerns about the need for heightened monitoring of these practices.

39.     The speed and precision that comes with algorithmic trading can easily be used to unlawfully manipulate the market. One of the most widely used disruptive and unlawful trading practices is "spoofing."

40.     Spoofing is a disruptive trading practice whereby a trader submits bids or offers with the intent to cancel the bid or offer before execution, submits or cancels bids and offers to overload the quotation system of a marketplace, or submits multiple bids or offers to create the appearance of false market depth.

41.    The CME acknowledges that the CFTC, under Rule 575, prohibits "spoofing," which includes "submitting or cancelling multiple bids or offers to create a misleading appearance of market depth and submitting or cancelling bids or offers with intent to create artificial price movements upwards or downwards."

42.    According to the DOJ, Bank of Nova Scotia's spoofing "inject[ed] false and misleading information into the precious metals futures market in order to deceive other market participants into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded."[12]

43.    Spoofing has been a significant problem within the COMEX and NYMEX precious metals markets, with several enforcement actions in recent years.

44.    Examples of recent spoofing penalties include;

(1) On March 31, 2016, traders Heet Khara and Nasim Salim were ordered to pay $1.38 million and $1.31 million civil fines, respectively, for spoofing precious metal futures between February 2015 and April 2015;[13]

(2) On January 29, 2018, Deutsche Bank AG and Deutsche Bank Securities Inc., collectively, were ordered to pay a $30 million civil fine for spoofing precious metal futures from at least February 2008 to at least September 2014;[14]

---

[12] *U.S. v. Bank of Nova Scotia*, No. 3:20-cr-00707, Information, ¶ 4, ECF No. 1 (D.N.J. Aug. 19, 2020).

[13] *Commodity Futures Trading Commission v. Khara*, No. 1:15-cv-03497, Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief, ECF No. 35 (S.D.N.Y. Mar. 31, 2016).

[14] *In the Matter of: Deutsche Bank AG and Deutsche Bank Securities, Inc*., CFTC Docket No. 18-06, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Jan. 29, 2018), https://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfdeutschebankagorder012918.pdf.

(3) Also on January 29, 2018, UBS AG was ordered to pay a $15 million civil fine for spoofing precious metal futures from at least January 2008 to at least December 2013;[15]

(4) Also on January 29, 2018, HSBC Securities (USA) Inc. was ordered to pay a $1.6 million civil fine for spoofing precious metal futures from at least July 2011 to at least August 2014;[16]

(5) On June 25, 2019, Merrill Lynch Commodities, Inc. was order to pay monetary sanctions totaling almost $25 million for spoofing precious metal futures from at least 2008 to at least 2014;[17]

(6) On August 20, 2019, Christian Trunz pled guilty to one count of conspiracy and one count of spoofing based on allegations that he engaged in spoofing precious metal futures between 2007 and 2016, and is currently awaiting sentencing.[18] Trunz has also settled charges with the CFTC;[19]

(7) On September 16, 2019, John Lawrence and his employer, Heraeus Metals New York LLC, were ordered to pay $130,000 and $900,000 civil fines, respectively, for spoofing precious metal futures from at least May 2017 to at least January 2018;[20]

(8) On September 30, 2019, Morgan Stanley Capital Group Inc. was ordered to pay a $1.5 million civil fine for spoofing precious metal futures from at least November 2013 to at least November 2014;[21]

---

[15] *In the Matter of: UBS AG*, CFTC Docket No. 18-07, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Jan. 29, 2018), https://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfusbagorder012918.pdf.

[16] *In the Matter of: HSBC Securities (USA) Inc.*, CFTC Docket No. 18-08, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Jan. 29, 2018), https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfhsbcsecuritiesorder012918.pdf.

[17] *In the Matter of: Merrill Lynch Commodities, Inc.*, CFTC Docket No. 19-07, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC June 25, 2019), https://www.cftc.gov/media/2141/enfmerrilllynchorder062519/download.

[18] *U.S. v. Trunz*, No. 1:19-cr-00375, Information, ECF No. 4 (E.D.N.Y. Aug. 19, 2019); *Trunz*, No. 1:19-cr-00375, Minute Order Granting Motion to Continue Sentencing (E.D.N.Y. May 4, 2020).

[19] *In the Matter of: Christian Trunz*, CFTC Docket No. 19-26, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Sept. 16, 2019), https://www.cftc.gov/media/2516/enfchristiantrunzorder091619/download.

[20] *In the Matter of: John Lawrence*, CFTC Docket No. 19-27, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Sept. 16, 2019), https://www.cftc.gov/media/2521/download?name=enfjohnlawrenceorder091619; *In the Matter of: Heraeus Metals New York LLC*, CFTC Docket No. 19-28, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Sept. 16, 2019), https://www.cftc.gov/media/2511/enfheraeusmetalsorder091619/download.

[21] *In the Matter of: Morgan Stanley Capital Group Inc.*, CFTC Docket No. 19-44, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Sept. 30, 2019), https://www.cftc.gov/media/2671/%20enfmorganstanleyorder093019/download.

(9) On September 30, 2019, Mitsubishi International Corporation was ordered to pay a $400,000 civil fine for spoofing precious metal futures from at least April 2016 to at least January 2018.[22]

**C.    Defendants Manipulated the Prices of Precious Metals Futures Contracts to Artificial Levels Throughout the Class Period**

45.    Defendant Bank of Nova Scotia admits that from at least 2008 through 2016, precious metals traders employed by BNS, including Defendant Flaum, "placed thousands of orders to buy and sell metals futures contracts with the intent to cancel those orders before execution." These orders "were intended to artificially move the prices of precious metals futures contracts in a direction that was favorable to the Subject Traders, and to inject false and misleading information into the precious metals futures markets in order to deceive other market participants into believing something untrue . . . This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling futures contracts at quantities, prices, and times that they otherwise would likely not have traded."[23]

46.    Defendants' manipulation of the markets for precious metals futures contracts caused prices to be artificial throughout the Class Period. This scheme enabled Defendants to benefit financially at the expense of Plaintiff and the Class. All trades outlined in the DPA and below were executed by traders in the course of their employment with BNS.

**1.    January 19, 2010**

47.    On January 19, 2010, ST-2 placed a genuine order to sell two gold futures contracts at the price of $1,134.00. ST-2 then placed a spoof order to buy 110 gold futures contracts at a price of $1,133.80. This spoof order sent false demand signals to the market, artificially raising

---

[22] *In the Matter of: Mitsubishi International Corporation*, CFTC Docket No. 19-46, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Sept. 30, 2019), https://www.cftc.gov/media/2681/enfmitsubishiorder093019/download.
[23] DPA at ¶ 4.

the price. Three milliseconds after ST-2 placed his spoof buy order, ST-2's pre-existing genuine sell order at the price of $1,134.00 was filled. Less than one second later, ST-2 cancelled the spoof orders without any of them being filled.[24]

### 2.    August 22, 2011

48.    On August 22, 2011, Defendant Flaum placed a genuine order to sell 25 gold futures contracts at a price of $1,891.00. Thirteen seconds later, Flaum placed a spoof order to buy 245 gold futures contracts at a price of $1,890.20. This spoof order sent false demand signals to the market, artificially raising the price. Less than two seconds after the spoof order was placed, Flaum's genuine order was filled. Less than two seconds after his genuine order was filled, Flaum canceled the spoof orders without any of them being filled.[25]

### 3.    June 28, 2012

49.    On June 28, 2012, ST-3 placed an order to sell three gold futures contracts at a price of $1,569.60. ST-3 then placed a spoof order to buy 150 gold futures contracts at a price of $1,569.00. This spoof order sent false demand signals to the market, artificially raising the price. Twenty-one milliseconds after the spoof order was placed, ST-3's genuine order began to fill, and within one second of the spoof order, ST-3's genuine order was fully executed. Less than three seconds after his genuine order was filled, ST-3 canceled the spoof orders without any of them being filled.[26]

### 4.    August 1, 2013

50.    On August 1, 2013, ST-4 placed two genuine orders to buy a total of 10 gold futures contracts at a price of $1,320.00. Four seconds later, ST-4 began placing a series of spoof orders

---

[24] DPA at Attachment A, ¶ 6.
[25] DPA at Attachment A, ¶ 10.
[26] DPA at Attachment A, ¶ 7.

to sell a total of 57 gold futures contracts at a price of $1,320.00. These spoof orders sent false supply signals to the market, artificially lowering the price. Shortly after the spoof order was placed, ST-4's genuine orders began to fill, and within one second of the spoof order, ST-4's genuine orders were fully executed. Less than 15 seconds after placing them, ST-4 canceled the spoof orders without any of them being filled.[27]

### 5. December 31, 2015

51.    On December 31, 2015, Defendant Flaum placed a genuine order to sell five gold futures contracts at a price of $1,060.40. Approximately 83 seconds later, Flaum placed a spoof order to buy 245 gold futures contracts at a price of $1,059.90. This spoof order sent false demand signals to the market, artificially raising the price. One millisecond after the spoof order was placed, Flaum's genuine order filled. Less than two seconds after his genuine order was executed, Flaum canceled the spoof orders without any of them being filled.[28]

### 6. May 25, 2016

52.    On or about May 25, 2016, Defendant Flaum placed a genuine order to buy three gold futures contracts at a price of $1,222.50. Approximately 10 seconds later, Flaum placed a spoof order to sell 145 gold futures contracts at a price of $1,223.20. This spoof order sent false supply signals to the market, artificially lowering the price. Seventy-two milliseconds after the spoof order was placed, Flaum's genuine order filled. Less than two seconds after his genuine order was executed, Flaum canceled the spoof orders without any of them being filled.[29]

53.    On the same day, Defendant Flaum placed a genuine order to buy 10 gold futures contracts at a price of $1,221.70. Approximately six seconds later, Flaum placed a spoof order to

---

[27] DPA at Attachment A, ¶ 11.
[28] DPA at Attachment A, ¶ 5.
[29] DPA at Attachment A, ¶ 8.

sell 145 gold futures contracts at a price of $1,222.20. This spoof order sent false supply signals to the market, artificially lowering the price. One millisecond after the spoof order was placed, Flaum's genuine order filled. As the price continued to fall, Flaum placed another genuine order to buy 10 gold futures contracts at a price of $1,221.40. After his second genuine order was executed, and less than 25 seconds after they were placed, Flaum canceled the spoof orders without any of them being filled.[30]

54.     The above are merely examples of Defendants' pervasive spoofing behavior throughout the entire class period, during which Plaintiff and the Class routinely bought and sold precious metals futures contracts.

## V.     CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself, and all others similarly situated. The Class is defined as:

> All persons and entities, other than Defendants and their employees, affiliates, parents, subsidiaries, co-conspirators (whether or not named in this Complaint), federal government entities and instrumentalities of the federal government, who purchased or sold any NYMEX or COMEX precious metals futures contract or any option on those futures contracts, during the period of at least January 1, 2008 through at least July 31, 2016.

56.     Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to establish sub-classes where appropriate.

57.     The Class is so numerous that joinder of all potential members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes

---

[30] DPA at Attachment A, ¶ 9.

that there are at least hundreds, if not thousands, of proposed members of the Class throughout the United States who transacted in NYMEX and COMEX precious metals futures contracts or any option on those futures contracts at artificial prices throughout the Class Period.

58.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising directly out of Defendants' common course of conduct in the violations of law as complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class, has no interest that is adverse to the interests of absent Class members, and has retained counsel competent and experienced in class action litigation, including commodity futures manipulation.

60.     Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful conduct, which was generally applicable to all the members of the Class, hereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

a)     Whether Defendants manipulated the price of any NYMEX and COMEX precious metals futures contract(s) or any option(s) on those futures contract(s), in violation of the CEA;

b)     Whether Defendants' manipulating of the price of any NYMEX and COMEX precious metals futures contract(s) or any option(s) on those futures contract(s) caused those prices to be artificial;

c)     Whether such manipulation resulted in artificial prices for precious metals futures contracts;

d)     Whether such manipulation caused a cognizable injury under the CEA;

e)     Whether Defendants' unlawful conduct caused actual damages to Plaintiff and the Class;

f)     Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

g)     Whether such injury or the extent of such price artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric analysis, or other economic tests;

h)     Whether Defendants fraudulently concealed their unlawful conduct;

i)      The identities of the participants in the manipulation;

j)      The duration of Defendants' unlawful conduct;

k)      The nature and extent of Defendants' violations; and

l)      The appropriate relief.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

62.     Class action treatment is warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members. The records of commodity futures traders are required to be maintained by Futures Commission Merchants.[31] Plaintiff does not anticipate any difficulties in identifying Class members, providing notice to Class members, or in any other aspects of the management of this action as a class action.

63.     The Class may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

64.     The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

---

[31] *Futures Commission Merchants (FCMs)*, U.S. COMMODITY FUTURES TRADING COMMISSION, *available at* https://www.cftc.gov/IndustryOversight/Intermediaries/FCMs/fcmibdisclosures.html (last accessed Aug. 27, 2020).

65.    The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical. The Class has a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

## VI.    EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

66.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful manipulation of the prices for NYMEX and COMEX precious metals futures contracts and options on such contracts. Moreover, by its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

67.    Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to manipulate and make artificial prices for precious metals futures contracts and options, by intentionally submitting and canceling trade orders in concert with each other.

68.    Defendants concealed their manipulative acts by, *inter alia*, placing electronic orders to buy or sell NYMEX and COMEX precious metals futures contracts at certain prices, even though they secretly had no intent of actually transacting at those prices. At no point did Defendants disclose that their orders were placed deceptively to manipulate the prices of NYMEX and COMEX precious metals futures contracts. Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than the date of the public disclosures thereof.

69.    Defendant BNS has repeatedly stated that it maintains procedures to ensure compliance with all applicable laws and regulations. Yet despite these assertions, Defendant BNS was subjected to a regulatory fine in 2018 for potential spoofing behavior, and the CFTC has

revealed that BNS made "false statements and omissions" to regulators during its investigations, which effectively concealed the extent and nature of Defendants' unlawful conduct.

70.     As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence before August 19, 2020 when the CFTC Order and DPA were released.

71.     Due to Defendants' fraudulent concealment and the self-concealing nature of Defendants' manipulative acts, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## VII.    VIOLATIONS ALLEGED

### FIRST COUNT

**For Manipulation in Violation of the Commodity Exchange Act
(7 U.S.C. §§1, *et seq.*)**

72.     Plaintiff incorporates by reference the preceding allegations.

73.     Each Defendant, individually, and in concert, and/or as one another's control persons or agents, through their acts alleged herein, from at least January 1, 2008 through at least December 31, 2016, specifically intended to and did cause unlawful and artificial prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts, in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

74.     Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

75.     During the Class Period, the prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts did not result from the legitimate market information and the forces of supply and demand. Instead, the prices of NYMEX and COMEX

precious metals futures contracts and options on those futures contracts were artificially inflated, or deflated, by Defendants' spoofing and other unlawful manipulative trading activities.

76.    Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled, specifically intending to cancel those orders prior to execution. Defendants did this with the intent to inject illegitimate information about supply and demand into the market place, and to artificially move prices up or down in a pre-determined direction to suit Defendants' own related trades and positions. As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in NYMEX and COMEX precious metals futures contracts and options on those futures contracts.

77.    Through their use of spoofing and other manipulative techniques, Defendants manipulated the prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts, throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold such instruments at the artificially inflated or deflated prices.

78.    At all times and in all circumstances previously alleged herein, Defendants had the ability to cause and did cause artificial prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts. Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for NYMEX and COMEX precious metals futures contracts and options on those futures contracts, and were aware of the effects of spoofing and other manipulative conduct on those markets.

79.    By their intentional unlawful conduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

80.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to having transacted at artificial prices for NYMEX

and COMEX precious metals futures contracts and options on those futures contracts, to which Plaintiff and the Class would not have been subject but for the unlawful conduct of the Defendants as alleged herein.

81.    Plaintiff and members of the Class are each entitled to actual damages sustained in NYMEX and COMEX precious metals futures contracts and options on those futures contracts for the violations of the CEA alleged herein.

## SECOND COUNT

### For Employing a Manipulative and Deceptive Device in Violation of the Commodity Exchange Act and Regulation 180.1(a) (7 U.S.C. §§1, *et seq.*)

82.    Plaintiff incorporates by reference the preceding allegations.

83.    Under Section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. § 9(1), and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC shall promulgate by not later than 1 year after July 21, 2010.

84.    In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a), which provides, in relevant part:

**§ 180.1 Prohibition on the employment, or attempted employment, of manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1)     Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2)     Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3)     Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4)     Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

85.     Defendants' unlawful conduct, as described herein, including systematically submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices in a pre-determined direction for NYMEX and COMEX precious metals futures contracts and options on those futures contracts, constitutes the employment of a manipulative and deceptive device.

86.     Defendants intentionally, or at least recklessly, violated Rule 180.1(a) by transacting in precious metals futures contracts—transactions for which Defendants had no legitimate economic purpose and instead which were engaged in for the sole purpose of influencing the final trading prices of said futures and options contracts at the expense of Plaintiff and the Class.

87.     By their intentional unlawful conduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

88.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to having transacted at artificial prices for precious metals futures contracts and options on those futures contracts, to which Plaintiff and the Class would not have been subject, but for the unlawful conduct of the Defendants as alleged herein.

89.    Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

### THIRD COUNT

**For Principal-Agent Liability for Violation of the Commodity Exchange Act**
**(7 U.S.C. §§1, *et seq.*)**

90.    Plaintiff incorporates by reference the preceding allegations.

91.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

92.    Plaintiff and members of the Class are each entitled to damages for the violation alleged herein.

### FOURTH COUNT

**For Aiding and Abetting Violations of the Commodity Exchange Act**
**(7 U.S.C. §§ 1, *et seq.*)**

93.     Plaintiff incorporates by reference the preceding allegations.

94.    As an alternative to Counts First, Second, and Third, and solely if Defendants (or any one of them) are not found liable for a primary violation of the CEA, Defendants are liable for aiding and abetting market manipulation.

95.    Each and every Defendant had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants.

96.    Each Defendant made and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

97.    Each Defendant supervised the making of and benefits from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

98.     Each Defendant, by and through their respective partners, agents, employees, and/or other persons, benefited from the manipulative acts and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the other Defendants.

99.     Each Defendant participated in the development of the manipulative scheme and participated in the execution of, and supervised, the manipulative acts. Each Defendant also benefited from the manipulative acts and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the other Defendants

100.    Defendants each played their component role and each knowingly aided, abetted, counseled, induced, or procured the violations alleged herein. Defendants did so knowing of each other's manipulations and suppression of NYMEX and COMEX precious metals futures and options contract prices, and willfully intended to assist these manipulations to unlawfully cause the price of NYMEX and COMEX precious metals futures and options contracts to be suppressed or to otherwise reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

101.    Plaintiff and members of the Class are each entitled to damages for Defendants' violations alleged herein.

## FIFTH COUNT

### Unjust Enrichment

102.    Plaintiff incorporates by reference the preceding allegations.

103.    Defendants financially benefited from their unlawful acts. As alleged herein, Defendants submitted spoof orders electronically and engaged in other unlawful manipulative techniques to manipulate the prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts, in an artificial and pre-determined direction. Defendants

intended to, and did, artificially alter prices in a pre-determined direction that benefited their trades and positions, at the expense of Plaintiff and the Class.

104.    These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact at artificial prices for precious metals futures contracts and options on those futures contracts.

105.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

106.    Each Defendant should be required to pay restitution for its own unjust enrichment to Plaintiff and members of the Class.

## VIII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

b)    For a judgment awarding Plaintiff and the Class damages, as well as punitive or exemplary damages, against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

c)    For a judgment awarding Plaintiff and the Class restitution of any and all amounts of Defendants' unjust enrichment;

d)    For an order imposing a constructive trust temporarily, preliminarily, permanently, or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

e)    For an order awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

f)    For such other and further relief as the Court may deem just and proper.

## IX.    **JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury for all issues so triable.

Dated: New York, New York.                    Respectfully submitted,
       September 4, 2020


By: */s/Matthew J. Geyer*
    Matthew J. Geyer
    Hollis Salzman
    Kellie Lerner
    David B. Rochelson
    **ROBINS KAPLAN LLP**
    399 Park Avenue, Suite 3600
    New York, NY 10022-4690
    klerner@robinskaplan.com
    mhollywood@robinskaplan.com
    Telephone: 212-980-7400
    Facsimile: 212-980-7499

    *Attorneys for Plaintiff Mark Serri and the
    Proposed Class*